**Andrew DiJOSEPH, et al., Plaintiffs,**

v.

**CITY OF PHILADELPHIA, et al., Defendants.**

**Civil Action No. 95–1803.**

United States District Court, E.D. Pennsylvania.

Oct. 22, 1996.

raised by the defendants in their motion for summary judgment, and that motion too will be dismissed without prejudice.

Armando A. Pandola, Jr., Philadelphia, PA, for Plaintiffs.

Jeffrey M. Scott, Philadelphia, PA, for defendants.

## MEMORANDUM

ANITA B. BRODY, District Judge.

Plaintiffs Andrew and Barbara DiJoseph [1] bring this action under 42 U.S.C. § 1983 against the City of Philadelphia, Police Commissioner Richard Neal, and police officers Deborah Mattiacci, George Hairston, and Carmen Vuotto. DiJoseph alleges violation of his Fourth and Fourteenth Amendment rights under the United States Constitution for the events surrounding the shooting of plaintiff Andrew DiJoseph on September 22, 1993. DiJoseph also alleges supplemental state tort claims against defendants for the same incidents. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, each of the defendants has moved for summary judgment. I will grant the motion with respect

to Officers Mattiacci and Hairston, Police Commissioner Neal, and the City of Philadelphia. I will deny the motion with respect to certain claims against Officer Vuotto and will grant the motion with respect to others.

## I. Facts

As the facts are in dispute, I will recite the material facts in a light most favorable to the plaintiffs. On September 22, 1993, Officers Mattiacci and Hairston of the Philadelphia Police Department responded to a radio report of a burglary at 6524 Dorel Street, Philadelphia, DiJoseph's residence. Dep. Deborah Mattiacci at 10. When the officers arrived, they were greeted by DiJoseph who was in possession of a gun.[2] Dep. George Hairston at 13. DiJoseph claimed that someone was trying to break into his home. *Id.* Officer Hairston disarmed DiJoseph, and afterwards the officers inspected the premises. *Id.* The officers found no evidence of a break-in. *Id.* Concerned for DiJoseph's well-being and anxious demeanor, Officer Hairston telephoned Barbara DiJoseph, DiJoseph's wife, at work regarding the sensibility of DiJoseph's possession of a handgun. *Id.* at 14. Ms. DiJoseph told the officers that it was safe for her husband to possess a gun despite his behavior and that her husband had a permit for the gun. *Id.* at 18. Ms. DiJoseph also advised the officers, however, that DiJoseph suffered from psychological problems, was on medication [3] and in therapy, and that he had been carjacked approximately one week before and that he had been acting more paranoid ever since. Barbara DiJoseph Aff. ¶ 2. Although the officers returned the gun to DiJoseph before leaving, they nevertheless visited Ms. DiJoseph at her workplace to discuss further the anxious behavior of her husband. Dep. George Hairston at 19.

Shortly after speaking to Ms. DiJoseph in person, Officers Mattiacci and Hairston re-

---

1. I will refer to Andrew DiJoseph as "DiJoseph" and Barbara DiJoseph as "Ms. DiJoseph." Ms. DiJoseph's claim is limited to one count for loss of consortium under state law.

2. The gun was a five-shot, two-inch barrel, 38. Dep. George Hairston at 14. Officer Hairston believed the gun was loaded. *Id.*

3. Officer Hairston's testimony disputes that Ms. DiJoseph ever mentioned her husband was on medication. Dep. George Hairston at 25.

ceived a police radio call of a man holding hostages at the DiJosephs' residence. *Id.* at 21–22. When Officers Mattiacci and Hairston returned to the scene, they could hear DiJoseph yelling from upstairs telling them to enter his home. Dep. Deborah Mattiacci at 26. The officers, however, discovered the door was locked. *Id.* DiJoseph yelled down that they should try to enter through the back door, but the officers found it locked as well. *Id.* When Officer Hairston instructed DiJoseph to open the door, DiJoseph responded that he could not because he was holding someone on the second floor. Dep. George Hairston at 23. Shortly thereafter, Lt. Anthony Guidice, a supervisor, arrived at the scene.[4] *Id.* at 24.

Based upon DiJoseph's irrational behavior, Lt. Guidice declared DiJoseph to be a "barricaded man."[5] Dep. Anthony Guidice at 23. As a result, the StakeOut Unit of the Philadelphia Police Department was called for reinforcement, and Officers Carmen Vuotto and Thomas Dorsey of StakeOut Unit Sam 101 responded. The StakeOut Unit is a support unit that responds to barricaded person, hostage, and high-risk warrant situations. Dep. Corporal DeJarnette at 8.

Upon arriving at the scene, Officers Vuotto and Dorsey were assigned to cover the rear of DiJoseph's residence for containment purposes. *Id.* at 21. Officer Vuotto took cover behind a tree, one hundred and eight (108) feet from the rear of DiJoseph's house.[6] Pls.' Police Diagram. About fifteen minutes later, DiJoseph appeared at the rear, third floor window, approximately twenty feet above the ground. Dep. Carmen Vuotto at 84. Officer Vuotto observed a white, heavyset male, Andrew DiJoseph, holding a stainless steel revolver in his right hand. *Id.* at 90. DiJoseph opened the window with both hands—palms up—with the gun beneath the window frame. *Id.* at 88. As the window did not have a screen or storm window attached, there was nothing separating DiJoseph from the outside. *Id.* at 89. From the window, DiJoseph advised the officers that he could not leave his house because he was detaining an intruder. *Id.* at 107. The officers unsuccessfully attempted to persuade DiJoseph to put his gun down. *Id.* at 108. DiJoseph repeatedly told the officers that he would not come out of his house but rather they would have to come into his home. *Id.* at 109. The officers believed, however, that DiJoseph wanted their help. Dep. Thomas Dorsey at 26.

Soon thereafter, DiJoseph started swinging his gun around, with his arm extended out the window. *Id.* at 27–28. At the same time, DiJoseph positioned himself in the window such that Officer Dorsey could not see him very well, and ultimately, Dorsey could only see DiJoseph's gun extended out from his arm. *Id.* at 30–31. DiJoseph aimed his gun at what appeared to be Officer Vuotto's position.[7] *Id.* at 32. At that point, Officer Vuotto fired one shot. *Id.* at 32. DiJoseph retreated into the room and then swung his gun around again out the window. *Id.* Officer Vuotto then fired the second shot and the third shot within a couple seconds of each other. *Id.*

---

4. Lt. Anthony Guidice, Corporal DeJarnette, and Officer Thomas Dorsey gave testimony but are not defendants in this suit.

5. DiJoseph maintains that labeling him a "barricaded man" was improper as irrationality is not a basis for which the term applies. Philadelphia Police Department regulations define a "barricaded person" as the following:

   A. A barricaded person is usually but not always, one or a combination of two basic types of individuals:
   (1) A suspect who may be cornered at or near a crime scene with or without a weapon.
   (2) Emotionally unstable person who has taken a position, inside or outside, and has indicated by action or implication that he intends to harm himself.

Philadelphia Police Department Directive 111.

6. DiJoseph alleges that "the tree behind which Officer Vuotto was taking cover was, in fact, one hundred and eight [108] feet, nine inches from the rear of Mr. DiJoseph's house, not including the additional twenty [20] feet that the window in which Mr. DiJoseph appeared was above ground level." Pls.' Answer to Defs.' Mot.Summ.J. at 5 (¶ 7). The police diagram upon which plaintiff's calculation is based, however, strongly suggests that DiJoseph has overestimated this distance.

7. Officer Dorsey and Officer Vuotto were separated by ten (10) feet. "[T]he way the gun was pointing it was more in [the direction of Officer Vuotto] ... The way it looked it was down towards the tree." Dep. Thomas Dorsey at 32.

Based upon Officer Dorsey's testimony, DiJoseph alleges that Officer Vuotto used excessive force against DiJoseph in violation of the Fourth Amendment. More specifically, DiJoseph contends that Officer Vuotto could not have seen his face at the time he shot DiJoseph, and therefore Vuotto could not have observed him look down his right arm—seemingly aiming through a rifle scope—and point the gun directly at the officer.[8] DiJoseph relies upon the fact that the officers stood approximately one hundred and eight (108) feet away from DiJoseph and twenty (20) feet below him, and furthermore, that the medical evidence reveals that DiJoseph had a gunshot wound in his right lower back, just above the buttocks—which seemingly contradicts Officer Vuotto's account of the incident. Hence, DiJoseph argues that such force could not have been "objectively reasonable" because Officer Vuotto could not have been reasonably threatened by the actions of the plaintiff.

In March 1994, DiJoseph was prosecuted for his involvement in the foregoing incident and pleaded guilty to the criminal charges of aggravated assault in the first degree, in violation of 18 Pa.C.S.A. § 2702, and possession of an instrument of crime, in violation of 18 Pa.C.S.A. § 907. The guilty plea has neither been overturned nor appealed.

## II. Discussion

Against Officers Mattiacci and Hairston, DiJoseph brings an action for violations of his Fourth and Fourteenth Amendment rights for failing to take the necessary action to properly secure him. Against Officer Vuotto, DiJoseph alleges an excessive force claim in violation of the Fourth Amendment. Against Police Commissioner Neal, DiJoseph brings an action for violation of his Fourth and Fourteenth Amendment rights for Neal's responsibility for the incident as the top policymaker for the Philadelphia Police Department. Against the City of Philadelphia, DiJoseph alleges violation of the Fourteenth Amendment substantive due process rights for failing to provide adequate training to its police officers regarding the difference between "mentally disturbed" individuals and barricaded persons. Furthermore, against each defendant, DiJoseph alleges violation of state law. I will discuss each of the claims against each of the parties.

### A. Officer Mattiacci and Officer Hairston

DiJoseph alleges that Officers Mattiacci and Hairston violated his Constitutional rights under the Fourth and Fourteenth Amendments for "failing to take the necessary action to properly secure Mr. DiJoseph by taking the handgun from him, and by taking him to be examined for his mental incapacity." Pls.' Answer to Defs.' Mot. Summ.J. at 19 ("Pls.' Answer"). I will analyze DiJoseph's claim under each Amendment in turn.

### 1. Fourteenth Amendment Claim

DiJoseph claims that Officers Mattiacci and Hairston violated his substantive due process rights under the state-created danger doctrine of the Fourteenth Amendment. Pls.' Answer at 10, 22–24. He contends that this violation occurred when the officers returned his handgun to him in his noticeably agitated state thereby increasing his risk of harm.[9] In their defense, officers Mattiacci and Hairston plead qualified immunity.

The first step in analyzing a defense of qualified immunity is determining whether

---

8. Officer Vuotto contends that DiJoseph turned his body so that his right side was facing towards Vuotto, extended his right arm, and pointed his gun directly at Vuotto. Furthermore, Vuotto testified that as DiJoseph extended his arm, Vuotto observed DiJoseph look down his right arm as if he were aiming through a rifle scope directly at Vuotto. It was at this time, Vuotto maintains, that he shot DiJoseph in self-defense. Dep. Carmen Vuotto at 115–119.

9. More specifically, DiJoseph alleges that the officers implemented improper police procedures. Given DiJoseph's agitated state, he claims he should have been classified as a "mentally disturbed person." As such, he should not have been given the gun back but rather should have been taken into custody for an immediate mental examination instead. Had the officers followed the proper procedures, DiJoseph contends, he would have sustained none of the injuries resulting from his confrontation with Officer Vuotto.

the plaintiff has alleged a violation of a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The next step is determining whether the alleged conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted).

Although DiJoseph may have asserted a prima facie case of a violation of his substantive due process rights as the law is presently understood in this Circuit, the state-created danger doctrine was not a clearly established theory of constitutional liability at the time this incident occurred. The Third Circuit Court of Appeals only recently adopted the state-created danger doctrine as a means of establishing § 1983 liability for constitutional violations under the Fourteenth Amendment substantive due process clause in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996)—nearly three years after the incident between DiJoseph and Officers Mattiacci and Hairston occurred. As the constitutional duties imposed upon police officers in this context were certainly unclear—if not unestablished—at the time of this incident, qualified immunity applies as directed by the Court in *Harlow*. I hold that qualified immunity applies to this case, and therefore will grant summary judgment on this claim.

### 2. Fourth Amendment Claim [10]

■ The Fourth Amendment of the United States Constitution states in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...

U.S. Const. amend. IV. The Fourth Amendment protects citizens from unreasonable (i.e., unlawful) searches and seizures. While

Officers Mattiacci and Hairston did search DiJoseph's home for evidence of an intruder, DiJoseph does not assert that any such search contravened the reasonable requirements necessitated by the Fourth Amendment. Furthermore, at no time did Officers Mattiacci and Hairston seize DiJoseph, nor does DiJoseph so allege. Quite simply, DiJoseph does not allege a Fourth Amendment violation. Therefore, I will grant defendants' Motion for Summary Judgment on this claim.

### III. Officer Vuotto

■ DiJoseph brings a claim of excessive force under the Fourth Amendment against Officer Vuotto for the injuries DiJoseph sustained from Vuotto's shooting.[11] Excessive force claims against law enforcement officers are determined by Fourth Amendment reasonableness standards. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The standard of "reasonable force" is judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. at 1872. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1872. The reasonableness standard is an objective standard: were Officer Vuotto's actions "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Id.* at 397, 109 S.Ct. at 1872–73.

In the present case, the facts surrounding Officer Vuotto's use of force are highly disputed. Officer Vuotto claims that he shot DiJoseph in self-defense, only after DiJoseph pointed his handgun directly at Officer Vuotto and appeared to be aiming through a rifle scope. Dep. Carmen Vuotto at 116. DiJo-

---

10. While, DiJoseph also alleges violations of his Fifth and Eighth Amendment rights, I fail to see how the Fifth or Eighth Amendments are implicated in any way whatsoever.

11. Officer Vuotto's shooting of DiJoseph constitutes a Fourth Amendment seizure. *Tennessee v.*

*Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").

seph claims that Officer Vuotto's statements are contradicted by the physical evidence and the testimony of others present on the scene. Namely, DiJoseph was shot in the lower, middle back, which he alleges would not have been possible had he actually been pointing his gun directly at Officer Vuotto, *see* Hosp. U.Pa.Med.R. "Discharge Summary"; Vuotto was approximately one hundred and eight (108) feet away from DiJoseph when he was shot; and Officer Dorsey—who was in relatively close proximity to Officer Vuotto [12]—testified that he could not see DiJoseph's face or head at the time of the shooting. Dep. Thomas Dorsey at 30–31.

Viewing these facts in a light most favorable to the plaintiff, I find that a claim of excessive force in violation of the Fourth Amendment exists concerning the circumstances under which DiJoseph was shot. Therefore, I will deny Officer Vuotto's Motion for Summary Judgment on DiJoseph's Fourth Amendment excessive force claim.

■ Notwithstanding the viability of DiJoseph's claim of excessive force, Officer Vuotto asserts that DiJoseph's claim is precluded by a previous state court conviction involving this same incident. On November 4, 1994, DiJoseph pled guilty to a charge of aggravated assault in the first degree before Judge Ricardo C. Jackson in the Court of Common Pleas Philadelphia County.[13] Vuotto asserts that collateral estoppel, or issue preclusion, bars DiJoseph's claim of excessive force.

■ State court judgments can preclude the relitigation of an identical issue that arises in a subsequent federal civil rights action under § 1983. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Under 28 U.S.C. § 1738, the preclusive effect of a state court judgment in a subsequent federal proceeding is determined by the law of the state in which the judgment was rendered. *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380–81, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985). Because DiJoseph entered his guilty

plea in a Pennsylvania state court, Pennsylvania law determines its preclusive effect.

■ Under Pennsylvania law, an issue is precluded from subsequent relitigation if the following criteria are met: (1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior action. *Gregory v. Chehi,* 843 F.2d 111, 121 (3d Cir.1988) (quoting *Safeguard Mutual Insurance Co. v. Williams,* 463 Pa. 567, 345 A.2d 664, 668 (1975)).

I must first decide whether the issue resolved by DiJoseph's guilty plea to a charge of aggravated assault in state court is identical to the issue presented before me today—whether Officer Vuotto's use of force was excessive. The Pennsylvania statute on aggravated assault states:

**(a) Offense defined.** A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

(2) attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a . . . police officer . . . in the performance of duty . . . ;

(3) attempts to cause or intentionally or knowingly causes bodily injury to a . . . police officer . . . in the performance of duty . . . ;

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon;

.    .    .    .    .

---

12. Officer Vuotto was ten feet from Officer Dorsey. Dep. Thomas Dorsey at 32.

13. DiJoseph also pled guilty to one count of possession of an instrument of crime, a misdemeanor, in violation of 18 Pa.C.S.A. § 907.

18 Pa.C.S.A. § 2702.[14] By contrast, an officer is liable for excessive force if such force is unreasonable from the perspective of a reasonable officer under the presented circumstances. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Because DiJoseph has already admitted that he attempted to cause bodily injury to Officer Vuotto, Vuotto contends that DiJoseph's guilty plea conclusively establishes Vuotto's use of force was reasonable. Vuotto's argument is flawed. Because none of the subsections of Pennsylvania's aggravated assault statute discuss the perspective of the victim of the purported assault, it is irrelevant under which subsection DiJoseph pled guilty. In every case, DiJoseph's guilty plea only conclusively establishes DiJoseph's state of mind at the time of the incident but does not establish the reasonableness of Officer Vuotto's actions in these circumstances. Vuotto is mistaken that DiJoseph's admission proves the material elements of his defense. To the contrary, DiJoseph's guilty plea cannot preclude litigation of a matter that has never been addressed. *See Linnen v. Armainis,* 991 F.2d 1102, 1106 (3d Cir.1993) (guilty plea is not implied admission that search which produced evidence leading to defendant's arrest was legal and was not barred in subsequent § 1983 action by issue preclusion).

Officer Vuotto also asserts that DiJoseph's claim of excessive force is barred by the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In *Heck,* the Court held that federal actions which challenge the legality of one's state conviction or imprisonment are not cognizable under § 1983 unless the conviction has been invalidated. *Id.* at ——, 114 S.Ct. at 2372. If a successful judgment under § 1983 would "necessarily imply the invalidity of [DiJoseph's outstanding] conviction," *Heck* requires the dismissal of the action. *Id.*

As I've already discussed in reference to issue preclusion, a finding in this trial that Officer Vuotto used excessive force in violation of DiJoseph's Fourth Amendment rights would not negate or annul DiJoseph's aggravated assault conviction. Both judgments could stand in their own respects. As a result, I find defendant's argument unpersuasive.

## IV. Police Commissioner Richard Neal

█ Because Police Commissioner Neal is the top policymaker for the Philadelphia Police Department, DiJoseph claims that Neal is also responsible for violations of his Fourth and Fourteenth Amendment rights that occurred because of Neal's official policies.[15] As a matter of law, however, it is insufficient to subject Commissioner Neal to liability in his individual capacity without first demonstrating Neal's personal involvement with the case at hand. *See Colburn v. Upper Darby Township,* 838 F.2d 663, 673 (3d Cir.1988) (police commissioner and mayor dismissed from suit because plaintiff's complaint did not allege that either was personally involved in any activity related to decedent's suicide). As DiJoseph does not produce any evidence which associates Commissioner Neal with this incident other than his official position within the police department, he does not meet his burden on this matter. I will therefore grant Neal's Motion for Summary Judgment.

## V. City of Philadelphia [16]

█ DiJoseph alleges that the City of Philadelphia is responsible for the violations

---

**14.** In the criminal complaint against DiJoseph, no subsection of the Pennsylvania statute on aggravated assault was specified. *See* Certified Copy of Conviction in matter of *Commonwealth of Pennsylvania v. Andrew DiJoseph,* March Term, 1994, NOS. 1235–1237. Nevertheless, it is not relevant for purposes of my analysis.

**15.** As the City's top policymaker, DiJoseph alleges that Commissioner Neal is responsible for establishing official policies for police procedures in dealing with barricaded persons and mentally disturbed individuals.

**16.** DiJoseph has apparently dropped his Fourth Amendment claim against the City of Philadelphia alleging a pattern and practice of excessive force by the police department. *See* Compl. at ¶ 31–34. DiJoseph now claims that the policy of which he complains concerns the City's "failure to provide adequate training to its police officers regard [sic] '302' cases and barricaded persons."

of his Fourteenth Amendment substantive due process rights for failing to provide adequate training to its police officers regarding the difference between "mentally disturbed" individuals and barricaded persons. In § 1983 cases, municipal liability attaches when "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).[17] In *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("*Canton*"), the Supreme Court expounded upon *Monell* by holding that the inadequacy of police training may serve as the basis for § 1983 liability only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204. Integrating *Canton* with *Monell*, the Court explained that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389, 109 S.Ct. at 1205.

In resolving the issue of municipal liability, DiJoseph must first show that the training program for the Philadelphia police officers concerning the differences between barricaded persons and "mentally disturbed" individuals is inadequate. *Id.* at 390, 109 S.Ct. at 1205–06. If "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, [then] the policymakers of the city can be said to have been deliberately indifferent to the need." [18] *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1064 (3d Cir.1991) (to establish deliberate indifference in failure to train, plaintiff must show that policymakers knew of magnitude of problem and either deliberately chose not to provide officers with training or acquiesced in a long-standing practice or custom of not providing training).

In the present case, DiJoseph has produced no probative evidence concerning the nature and quality of the Philadelphia Police Department's present training program concerning mentally disturbed individuals or barricaded persons. In making his case of municipal liability, DiJoseph incorrectly focuses upon the actions of the officers instead of the policies of the city and, hence, improperly extrapolates his experience with police officers as an indicia of inadequate police training citywide. For example, DiJoseph's expert witness, Dr. Leonard Territo, asserts that Officers Mattiacci and Hairston were not properly trained in how to deal with emotionally disturbed individuals given the way they acted in this situation.[19] Under

Pls.' Answer at 33. I proceed with the understanding that this, indeed, is the plaintiff's claim.

17. In *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), the Supreme Court outlined the proper analysis for § 1983 actions against municipalities: a court must determine (1) whether a constitutional violation caused the plaintiff's harm, and, if so, (2) whether the city is responsible for that violation under the Court's teachings of *Monell* and its progeny. *Id.* at 120, 112 S.Ct. at 1065–66. For the purposes of this section only, I will assume that DiJoseph's Fourteenth Amendment substantive due process rights were violated under the state-created danger doctrine. I therefore proceed to examine the specific issue of whether the City of Philadelphia is responsible for that violation under *Monell* and its progeny.

18. In her concurrence, Justice O'Connor rephrases the Court's understanding of the deliberate indifference for failure to train:

[I]f the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied. Only then can it be said that the municipality has made " 'a deliberate choice to follow a course of action ... from among various alternatives.' "

*Id.* at 396, 109 S.Ct. at 1208–09 (O'Connor, J., concurring in part and dissenting in part) (citations omitted).

19. The information provided by Dr. Territo is not responsive to the issue of municipal liability in this case. Dr. Territo's most relevant testimony on this issue states:

The actions of these officers, first, to return a deadly weapon to Mr. DiJoseph, and second, their failure to take him into custody for an emergency examination demonstrates that these officers were not properly trained in how to deal with emotionally disturbed persons, [sic]

Op. Dr. Leonard Territo at 7.

*Canton,* DiJoseph cannot properly demonstrate that the City failed to train its police officers simply through proffering one example of police misconduct. That alone is insufficient. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." *Id.* at 390, 109 S.Ct. at 1206. Under *Canton,* DiJoseph must show that the city had notice of the problems arising from inadequate police training concerning mentally disturbed individuals and barricaded persons and that the city nonetheless made a conscious decision not to address those problems. In this case, however, DiJoseph establishes no such prior history of this problem nor does he illustrate how the city failed to respond to it. Although DiJoseph casts considerable doubts upon whether the officers on duty implemented improper procedures, *Monell* made clear that "a municipality cannot be held liable solely because it employs a tortfeasor." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036.

In the second step in establishing municipal liability, DiJoseph must show that the identified inadequacy in the police training program caused his ultimate injuries. *Canton,* 489 U.S. at 391, 109 S.Ct. at 1206; *see also Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged). Because DiJoseph does not demonstrate the inadequacy of the present training program, however, he cannot illustrate how such inadequacy caused his injuries. Hence, DiJoseph's § 1983 claim against the City fails, and I will grant its Motion for Summary Judgment on this matter.

### VI. Supplemental State Claims

DiJoseph also brings state tort law claims against the City of Philadelphia for negligence and against Officers Mattiacci, Hairston, and Vuotto, and Commissioner Neal for negligence, assault and battery, and loss of consortium, and negligent and intentional infliction of emotional distress. All of the defendants claim that the Pennsylvania Political Subdivision Tort Claims Act (the "Tort Claims Act"), 42 Pa.C.S.A. §§ 8541–8564, immunizes them from suit.

Under § 8541 of the Tort Claims Act, the City of Philadelphia is immune from suit unless the claim arises under one of the enumerated exceptions detailed in § 8542. Liability may be imposed on the city for acts falling within the following categories: (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody, or control of animals. *Cooper v. City of Chester,* 810 F.Supp. 618, 625 (E.D.Pa.1992); *see also* 42 Pa.C.S.A. § 8542(b). Since DiJoseph's claim of negligence does not fall within any of these excepted categories, the City of Philadelphia is immune from suit on this claim of negligence. I will therefore grant summary judgment for the City of Philadelphia on this claim.

■ Immunity for Officers Mattiacci, Hairston, Vuotto, and Commissioner Neal is governed by § 8545 of the Tort Claims Act. Under § 8545, employees of municipal agencies are immune from suit, but only if the employees did not cause the harm from "willful misconduct." 42 Pa.C.S.A. § 8550. Thus, an employee will not remain personally liable for negligence, but generally will remain so for his or her intentional torts. *Illiano v. Clay Township,* 892 F.Supp. 117, 121 (E.D.Pa.1995).

■ Officer Vuotto is immune from suit on the basis of negligence and negligent infliction of emotional distress under § 8545. As the claims of assault and battery, intentional infliction of emotional distress, and loss of consortium allege "willful misconduct," however, Vuotto is not immune. As such, I will grant Vuotto's Motion for Summary Judgment on the claim of negligence and negligent infliction of emotional distress and deny his motion on the claims of assault and battery, intentional infliction of emotional distress, and loss of consortium.

■ Officers Mattiacci and Hairston are also immune from suit on the basis of negligence and negligent infliction of emotional distress under § 8545. I will therefore

**844**

grant summary judgment with respect to these claims. In addition, as these officers did not touch or threaten DiJoseph with contact, I find that the facts do not support any claim for assault and battery against Mattiacci and Hairston. Thus, I will also grant summary judgment on these claims. As for DiJoseph's claim for intentional infliction of emotional distress against Mattiacci and Hairston, DiJoseph must prove that the officers' conduct (1) was extreme and outrageous, (2) was intentional or reckless, (3) caused emotional distress, and (4) that the distress is severe. *Williams v. Guzzardi,* 875 F.2d 46, 51 (3d Cir.1989). Because there is no indication that Mattiacci or Hairston intended to cause distress to DiJoseph or that they knew with substantial certainty that such a result would occur, the record does not support such a claim. As a result, I will grant summary judgment on DiJoseph's intentional infliction of emotional distress claim. Finally, because DiJoseph's loss of consortium claim is derivative in nature, it should be dismissed as all other state law claims against Officers Mattiacci and Hairston have been dismissed. *Hooten v. Pennsylvania College of Optometry,* 601 F.Supp. 1151, 1155 (E.D.Pa.1984).

Commissioner Neal is also immune from suit on the basis of negligence and negligent infliction of emotional distress under § 8545. I will therefore grant his Motion for Summary Judgment on these claims. In addition, I have already determined above that Commissioner Neal has no connection to the facts of this case. Without his personal involvement, he cannot be found liable for any intentional torts. I therefore grant summary judgment in favor of Commissioner Neal on DiJoseph's claims of assault and battery, intentional infliction of emotional distress, and loss of consortium.