Andrew DiJOSEPH, et al., Plaintiffs,

v.

CITY OF PHILADELPHIA,
et al., Defendants.

Civil Action No. 95–1803.

United States District Court,
E.D. Pennsylvania.

Jan. 31, 1997.

Armando A. Pandola, Jr., Philadelphia, PA, for Andrew DiJoseph, Barbara DiJoseph.

Jeffrey M. Scott, Assistant City Solicitor, Philadelphia, PA, for City of Philadelphia, Richard Neal, Carmen Vuotto, Deborah Mattiacci, George Hairston.

### MEMORANDUM

ANITA B. BRODY, District Judge.

Plaintiff Andrew DiJoseph ("DiJoseph") brings this motion for reconsideration ("Motion for Reconsideration") of the judgment I entered in favor of defendant police officers Deborah Mattiacci and George Hairston, Philadelphia Police Commissioner Richard Neal, and the City of Philadelphia in *DiJoseph v. City of Philadelphia*, 947 F.Supp. 834 (E.D.Pa.1996), 1996 WL 691534 (No. 95–1803, Oct. 22, 1996) (*DiJoseph I*).[1] DiJoseph alleges that Officers Mattiacci and Hairston violated his Fourteenth Amendment substantive due process rights under the state-created danger doctrine by failing to take the necessary action to properly secure him. In *DiJoseph I*, I granted qualified immunity to Officers Mattiacci and Hairston because I found that the state-created danger doctrine was not clearly established law at the time the incidents in question occurred. Because I granted the officers qualified immunity, I

did not reach the merits of DiJoseph's state-created danger claim in *DiJoseph I*. DiJoseph now urges me to reconsider my ruling of qualified immunity in light of case law that predates the shooting of DiJoseph that references and/or applies the state-created danger doctrine. Because upon closer examination I now conclude that the state-created danger doctrine was clearly established in the Third Circuit at the time DiJoseph was shot, I must address for the first time the viability of DiJoseph's state-created danger claim as it pertains to Officers Mattiacci and Hairston. In addition, DiJoseph requests that I reconsider liability for Officers Mattiacci and Hairston because he claims they allowed him to be called a "barricaded man," even though they knew, in fact, that he was not.[2]

DiJoseph also requests me to reconsider summary judgment I granted in favor of Police Commissioner Neal and the City of Philadelphia. DiJoseph contends that City policy does not differentiate between the treatment of barricaded persons and mentally disturbed individuals.[3] Because he was not a criminal, had not threatened anyone, and had not harmed anyone, DiJoseph claims that treating him as a barricaded person indicates that the City has adopted an unconstitutional policy or practice whereby non-criminals are treated as criminals; that is, mentally disturbed individuals are treated as barricaded persons. This policy, he asserts, facilitated this unfortunate shooting and denied DiJoseph of his substantive due process right of liberty. DiJoseph therefore main-

---

1. In this opinion, citations to the Motion for Summary Judgment refers to the initial summary judgment submissions by the parties. References to the Motion for Reconsideration alludes to the most recent submissions requesting me to reevaluate my initial judgment in *DiJoseph I*.

2. I did not consider this in *DiJoseph I* because it was not clear that DiJoseph was asserting this as a separate argument. Under the section entitled, "Failure to Take Action Pursuant to a "302" [section of Pennsylvania state law that requires police to take into custody a person who is mentally disturbed for examination] Commitment", Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment states:

    Officers Mattiacci and Hairston had the duty to confiscate Mr. DiJoseph's handgun and to take

him into custody for the purposes of an involuntary examination pursuant to the Pennsylvania Mental Health Procedures Act. Instead of doing this, they allowed Mr. DiJoseph to be declared a "barricaded" person, knowing that he was a disturbed individual, who was under psychiatric treatment, rather than a criminal seeking to harm someone.

Pl.'s Mem. L. Resp. Defs.' Mot. Summ. J. at 24–25. While I addressed DiJoseph's state-created danger theory with respect to the officers' failure to take the gun away from DiJoseph, I did not consider whether the officers' actions in allowing DiJoseph to be declared a "barricaded man" was actionable. For purposes of the Motion for Reconsideration, I will consider this argument preserved.

3. DiJoseph uses the terms "mentally disturbed" and "emotionally disturbed" interchangeably.

tains that Commissioner Neal and the City of Philadelphia should be held liable because of the inadequacy of the City's policies concerning emotionally disturbed individuals.[4]

Upon consideration of the parties' submissions, I will grant plaintiff's Motion for Reconsideration. I will also grant summary judgment with respect to Officers Mattiacci and Hairston because I conclude that DiJoseph has failed to establish a state-created danger claim against them. Furthermore, I will grant summary judgment with respect to Commissioner Neal because DiJoseph fails to demonstrate Neal's personal involvement with the actions that give rise to this action. Finally, I will also grant summary judgment with respect to the City of Philadelphia because DiJoseph has failed to state a claim under § 1983 against it.

As the facts of this case are set forth fully in *DiJoseph I,* I will recite only the facts relevant to this motion here.

## I. Facts

On September 22, 1993, Officers Deborah Mattiacci and George Hairston of the Philadelphia Police Department responded to a radio report of a burglary at 6524 Dorel Street, Philadelphia, DiJoseph's residence. Dep. Deborah Mattiacci at 10. When the officers arrived, DiJoseph met them and had a gun in his possession. Dep. George Hairston at 13. Officer Hairston disarmed DiJoseph. *Id.* Although DiJoseph claimed that someone had attempted to break into his home, the officers found no such evidence.

*Id.* Concerned about DiJoseph's anxious behavior, Officer Hairston telephoned Barbara DiJoseph, DiJoseph's Wife, at work regarding the sensibility of DiJoseph having a gun in his possession. *Id.* at 14. Ms. DiJoseph told the officers that it was safe for her husband to possess a gun despite his behavior and that her husband had a permit for the gun. *Id.* at 18. Ms. DiJoseph also advised the officers that DiJoseph suffered from psychological problems, was on medication [5] and in therapy, and that he had been carjacked approximately one week before and that he had been acting more paranoid ever since. Barbara DiJoseph Aff. ¶ 2. Although the officers returned the gun to DiJoseph before leaving, they nevertheless visited Ms. DiJoseph at her workplace to further discuss further her husband's anxious behavior. Dep. George Hairston at 19.

Shortly after speaking to Ms. DiJoseph in person, Officers Mattiacci and Hairston received a police radio call of a man holding hostages at the DiJosephs' residence. *Id.* at 21–22. Officer Hairston called for a supervisor to assist them on the scene, *id.* at 24, and shortly thereafter, Lt. Anthony Guidice, a supervisor, arrived.[6] *Id.* at 24. Based upon DiJoseph's "irrational" behavior, Lt. Guidice declared DiJoseph to be a "barricaded man."[7] Dep. Anthony Guidice at 23. Ultimately, DiJoseph was shot by a police officer, Carmen Vuotto, and he contends, *inter alia,* that the City of Philadelphia Police Department's unconstitutional policies regarding the

---

**4.** In *DiJoseph,* I addressed this issue with respect of the City of Philadelphia's failure to train, which under *City of. Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), can constitute an official policy holding municipalities liable under *Monell v. New York City Dep't of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). DiJoseph now urges me to consider this argument with respect to the official policies of the city independently of the alleged failure to train. I did not consider this in my earlier opinion because it was unclear to me that DiJoseph advanced this as a separate argument. For purposes of this Motion for Reconsideration, I will consider this argument preserved.

**5.** Officer Hairston's testimony disputes that Ms. DiJoseph ever mentioned her husband was on medication during this telephone conversation. Dep. George Hairston at 25.

**6.** Lt. Anthony Guidice gave testimony but is not a defendant in this suit.

**7.** DiJoseph maintains that labeling him a "barricaded man" was improper as irrationality is not a basis for which the term applies. Philadelphia Police Department regulations define a "barricaded person" as the following:

A. A barricaded person is usually but not always, one or a combination of two basic types of individuals:
(1) A suspect who may be cornered at or near a crime scene with or without a weapon.
(2) Emotionally unstable person who has taken a position, inside or outside, and has indicated by action or implication that he intends to harm himself.
Philadelphia Police Department Directive 111.

treatment of mentally disturbed individuals as barricaded persons is responsible for his injuries.

## II. Discussion

DiJoseph requests reconsideration of summary judgment in favor of Officers Mattiacci and Hairston for violating his Fourteenth Amendment substantive due process rights under the state-created danger theory for giving the handgun back to DiJoseph and failing to take him into custody for an immediate mental evaluation. In addition, DiJoseph requests reconsideration of the judgment in favor of Officers Mattiacci and Hairston on the grounds that they affirmatively allowed him to be declared a barricaded man, even though they allegedly knew that he was not. Moreover, DiJoseph requests reconsideration of the judgment in favor of Police Commissioner Neal and the City of Philadelphia on the basis that the City has adopted an unconstitutional policy or practice by treating emotionally disturbed individuals as barricaded persons.

I will deal with each claim in turn.

## A. State–Created Danger

DiJoseph claims that Officers Mattiacci and Hairston violated his Fourteenth Amendment substantive due process rights under the state-created danger doctrine when they returned his gun to him despite obvious indications that he was emotionally disturbed. Because the officers failed to properly secure him by taking the handgun away from him and taking him into custody for a mental evaluation, DiJoseph asserts that they increased his risk of harm. While I held in *DiJoseph I* that Officers Mattiacci and Hairston were entitled to qualified immunity on summary judgment, DiJoseph contends that they are not entitled to qualified immunity because the state-created danger theory of liability was clearly established on September 22, 1993, the date DiJoseph was shot. I will first review my former conclusion that the state-created danger doctrine

was not clearly established at the time of this incident. Because upon closer inspection I determine that it was clearly established, I will then examine for the first time whether DiJoseph has sufficiently established a prima facie violation of the state-created danger doctrine to withstand defendants' Motion for Summary Judgment.

The state-created danger doctrine was triggered by *DeShaney v. Winnebago Co. Dep't of Social Serv.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).[8] In *DeShaney*, the Court considered whether the Fourteenth Amendment substantive due process clause imposed an affirmative duty upon a state to protect a child from his abusive father while within his father's custody. While holding that no affirmative duty existed, the Court acknowledged that:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.

*Id.* at 201, 109 S.Ct. at 1006. Thus, as courts have interpreted this statement, state-created danger exists " '[w]hen state actors knowingly place a person in danger, the due process clause of the constitution ... render[s] them accountable for the foreseeable injuries that result from their conduct.' " *Mark v. Borough of Hatboro*, 51 F.3d 1137 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995) (quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 199 (5th Cir.), *cert. denied* —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995)). To be liable under the state-created danger doctrine, the state actor must have created the danger to the plaintiff, increased the plaintiff's risk of harm, or made the plaintiff more vulnerable to the harm. *Kneipp v. Tedder*, 95 F.3d 1199, 1207 (3d Cir.1996). As Judge Richard A. Posner of the Seventh Circuit states, "If the state puts a man in a position of danger ... and then fails to protect him, it will not be heard to say that its role was merely

---

8. There are, however, decisions from other circuits holding a state liable for the dangers it creates or exacerbates that predate the Supreme Court's *DeShaney* opinion. *See White v. Roch-*

*ford*, 592 F.2d 381 (7th Cir.1979) (police created danger to children when they abandoned the children in a car on the highway after arresting the driver).

passive." *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982).

The Third Circuit formally adopted the state-created danger theory as a viable mechanism for establishing constitutional violations under 42 U.S.C. § 1983 in *Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996). Before I consider whether the state-created danger doctrine applies in this case, however, I must first determine whether, in fact, that theory was a clearly established and viable mechanism for constitutional redress under § 1983 on September 22, 1993, the date DiJoseph was shot.

**1. Was the state-created danger theory clearly established law on September 22, 1993?**

█ DiJoseph asserts that Officers Mattiacci and Hairston violated his substantive due process rights under the state-created danger doctrine of the Fourteenth Amendment. He argues that this violation occurred when the officers returned his handgun to him in his noticeably agitated state, thereby increasing his risk of harm. Concomitant with this claim, DiJoseph alleges that the officers implemented improper police procedures. Because of his manifestly anxious demeanor, DiJoseph contends that he should have been classified as a "mentally disturbed person" (a "302" case) and thus should have been taken into custody for an immediate mental evaluation. While Officers Mattiacci and Hairston plead qualified immunity, DiJoseph argues that they are not so entitled because the state-created danger doctrine was clearly established law at the time these incidents occurred on September 22, 1993.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court described the "clearly established standard":

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039. In order to determine whether the right was clearly established, the court must look to the status of the law at the time the incident in question occurred. *Burns v. County of Cambria,* 971 F.2d 1015, 1024 (3d Cir.1992).

The Third Circuit has adopted a "broad view of what constitutes an established right of which a reasonable person would have known." *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989) (quoting *Sourbeer v. Robinson,* 791 F.2d 1094, 1102 (3d Cir.1986)). The absence of a previous decision adjudicating the constitutionality of the questioned conduct is not dispositive as to whether the right was clearly established. *Bieregu v. Reno,* 59 F.3d 1445, 1459 (3d Cir.1995); *see also Good v. Dauphin County Social Serv. for Children and Youth,* 891 F.2d 1087, 1092 (3d Cir.1989) (to find law is clearly established, "it is not necessary that there have been a previous precedent directly [on] point."). In order for a court to find a right is clearly established, there must be "some but not precise factual correspondence between relevant precedents and the conduct at issue." *In re City of Philadelphia Litig.,* 49 F.3d 945, 970 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995) (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs,* 747 F.2d 139, 144 (3d Cir.1984)). Under this standard, officials are not expected to predict subsequent developments in the law, but "they are required to relate established law to analogous factual settings". *In re City of Philadelphia,* 49 F.3d at 970.

In his Motion for Reconsideration, DiJoseph asserts that the state-created danger theory of liability under the Fourteenth Amendment substantive due process clause was clearly established law at the time he was shot on September 22, 1993, even though

the Third Circuit did not formally adopt that theory as a viable mechanism for establishing a constitutional violation until September 1996 in the case of *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996). DiJoseph implies that on September 22, 1993, police officers within this Circuit would have sufficiently understood that putting someone in a position of danger would violate their substantive due process life or liberty interests. In support, DiJoseph points to pre-*Kneipp* cases in which the Third Circuit set forth its state-created danger policy and other circuits that have also recognized state-created danger liability.

As previously mentioned, the Supreme Court's comment in the 1989 case, *DeShaney v. Winnebago Co. Dep't of Social Serv.*, 489 U.S. 189, 201, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989), explaining that the state "played no part in [the] creation [of the dangers to Joshua DeShaney], nor did it do anything to render him any more vulnerable to them," is the primary source upon which recognition of the state-created danger doctrine is based. Several courts have referred to this comment in support of their recognizing liability under a state-created danger theory of the Fourteenth Amendment substantive due process clause to establish a claim under 42 U.S.C. § 1983. *See Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.1993) ("DeShaney ... leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger."); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993) ("We read the *DeShaney* Court's analysis to imply that ... an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate [the plaintiff's Due Process] rights."); *Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir.1990) ("It is not clear, under *DeShaney* how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect. It is clear, though, that at some point such actions do create such a duty."); *Cornelius v. Town of Highland Lake, Alabama*, 880 F.2d 348, 356 (11th Cir.1989) ("[Unlike *DeShaney*,] the defendants did indeed create the dangerous

situation...."); *Swader v. Commonwealth of Virginia*, 743 F.Supp. 434, 442 (E.D.Va. 1990) ("[T]his Court finds that the State's involvement in the creation of the circumstances resulting in Billie Jo Dickens's death is much more closely interrelated to her death than [in the *DeShaney* case].").  All of the aforementioned cases were decided before September 22, 1993, the date DiJoseph was shot.

Several circuit courts also have acknowledged the viability of a state-created danger doctrine under the Fourteenth Amendment substantive due process clause before September 22, 1993. Ten years before *DeShaney*, in 1979, the Seventh Circuit recognized the state-created danger doctrine in *White v. Rochford*, 592 F.2d 381 (7th Cir.1979). In *White*, the Seventh Circuit reversed the district court's granting of the defendants' Motion to Dismiss on state-created danger grounds. Although the court did not use the phrase "state-created danger" in that opinion, the court's articulation of the question clearly indicates that the court premised liability upon a state-created danger theory:

> [T]he issue before this court is whether the unjustified and arbitrary refusal of police officers to lend aid to children endangered by the performance of official duty violates the constitution where that refusal ultimately results in physical and emotional injury to the children. We hold that such conduct indisputably breaches the Due Process Clause.

*Id.* at 383. In 1988, in *Wells v. Walker*, 852 F.2d 368 (8th Cir.1988), the Eighth Circuit recognized the state-created danger doctrine as a viable theory of constitutional infraction:

> [W]hen the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in ... an affirmative right to protection by the state may arise in favor of the victim of private violence.

*Id.* at 371. In 1989, in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), the Ninth Circuit denied qualified immunity to a State Trooper in a state-created danger case when a woman passenger in a car was raped after the trooper left her stranded in a high crime area at

2:30 a.m. after arresting the drunk driver and impounding his car. Despite the fact that this was the first time the Ninth Circuit recognized and applied the state-created danger doctrine, it determined that the law was nevertheless clearly established in the Ninth Circuit: "By 1984, the law had been established by [*White v. Rochford*, 592 F.2d 381 (7th Cir.1979)] and clearly articulated by [*Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982)] and [*Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983)]." *Id.* at 594. Hence, qualified immunity would not protect the trooper from suit. Also in 1989, the Eleventh Circuit predicated constitutional liability upon a "special danger" theory which closely resembles the state-created danger theory of liability. *Cornelius v. Town of Highland Lake, Alabama*, 880 F.2d 348 (11th Cir.1989) (genuine issue of material fact whether defendants affirmatively created dangerous situation by establishing a work squad of unsupervised inmates to work around Town Hall when two dangerous inmates abducted Town Hall clerk and threatened to sexually and physically abuse her and kill her). In the special danger context, the *Cornelius* court also imposed a nexus requirement compelling a sufficiently close nexus between the defendant's conduct and the violation of the plaintiff's Fourteenth Amendment rights to appropriately establish a claim.

In addition to these cases, several other circuit and district court cases acknowledged—without necessarily applying—the validity of the state-created danger doctrine. *See K.H. v. Morgan*, 914 F.2d 846 (7th Cir. 1990) (state liable for creating danger of child abuse by placing child with foster parents who had known propensity to neglect); *Robbins v. Maine Sch. Admin. Dist.*, 807 F.Supp. 11, 13 (D.Maine 1992) ("A state may be held liable if it can fairly be said to have affirmatively acted to created or exacerbate a danger to the victims."); *Williams v. City of Boston*, 599 F.Supp. 363, 366 (D.Mass.1984) ("Other cases imposing § 1983 liability involve circumstances where the state officer place[s] the victim in a position of peril."). That courts recognized the doctrine (if not the name) of state-created danger before *De-Shaney* and even more so after *DeShaney*

but before September 22, 1993, tends to show that the state-created danger doctrine was clearly established by the time DiJoseph was shot.

Even more persuasive, upon closer examination the state-created danger doctrine also appeared to be a viable theory for constitutional redress in the Third Circuit on September 22, 1993. Despite the fact that the state-created danger doctrine was not formally adopted until September 1996, in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996), the question of whether the Third Circuit would in fact "adopt" the state-created danger doctrine did not appear to arise until after September 22, 1993. In *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995), the Third Circuit infused doubt into whether the state-created danger doctrine was a recognized theory of constitutional liability when it stated:

> For our part, we have yet to decide definitively whether the state-created danger theory is a viable mechanism for finding a constitutional injury.

*Id.* at 1152. Because qualified immunity analysis requires the court to determine whether "a reasonable official would understand that what he is doing violates [a] right," I must examine how the state-created danger doctrine appeared to a reasonable official on September 22, 1993, without the benefit of the Third Circuit's subsequent pronouncements.

The Third Circuit first addressed a state-created danger theory of constitutional liability in 1990 in *Brown v. Grabowski*, 922 F.2d 1097 (3d Cir.1990). In denying its applicability to that case, the Third Circuit stated:

> Plaintiff has provided no evidence to show, as *DeShaney* would appear to require, that either defendant affirmatively barred the door to the civil court to [the plaintiff], that he otherwise limited her freedom to act on her own behalf, or that he created or exacerbated the danger that [the third party] posed to her.

*Id.* at 1116. While acknowledging that other courts of appeals had applied the state-created danger theory, the Third Circuit simply

distinguished *Brown* on its facts without giving any indication that the state-created danger doctrine might not be a viable theory upon which to seek constitutional redress.[9] In 1992, the Third Circuit revisited the state-created danger doctrine in *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364 (3d Cir.1992) (in banc). Once again, however, the Third Circuit distinguished the facts of that case from those in which courts applied the state-created danger doctrine to find the state liable without expressing hesitation about whether it would acknowledge a state-created danger theory were the facts to present themselves. The language of the court suggests, however, that recognition of the state-created danger doctrine was not in issue:

> Although we find this to be an extremely close case, and certainly a tragedy, we are convinced that the school defendants did not create plaintiffs' peril, increase their risks of harm, or act to render them more vulnerable to the student defendants' assaults.

*Id.* at 1374. Thus, the court's language suggests that had the school defendants created the plaintiffs' peril, increased their risks of harm, or acted to render the plaintiffs more vulnerable to the harm, then liability would have attached in that case.

In support of this, I refer to the pre-*Kneipp,* pre-September 22, 1993, companion cases decided by Judge Robert S. Gawthrop, III, of the Eastern District of Pennsylvania, *C.M. v. Southeast Delco Sch. Dist.,* 828 F.Supp. 1179 (E.D.Pa.1993) (June 29, 1993), and *K.L. v. Southeast Delco Sch. Dist.,* 828

F.Supp. 1192 (E.D.Pa.1993) (July 27, 1993). In those cases under the law as the judge understood it in June and July 1993, Judge Gawthrop held that the state-created danger theory could withstand summary judgment in a case suing school officials for failing to protect students from a teacher by subjecting students to danger when they knew or should have known about the teacher's physically and sexually offensive and abusive conduct towards the students.

Although decided after DiJoseph was shot, other cases in the Eastern District of Pennsylvania also reveal that judges within this district understood that the state-created danger theory was a recognized basis upon which to establish liability for constitutional violations before *Mark v. Borough of Hatboro,* 51 F.3d 1137 (3d Cir.1995), or *Kneipp v. Tedder* were decided.[10] On January 31, 1995, in *Hartman v. Bachert,* 880 F.Supp. 342 (E.D.Pa.1995), Judge Franklin S. Van Antwerpen considered the applicability of the state-created danger doctrine when a widow of a deputy sheriff filed suit against, *inter alia,* city police officers for failing to assist her husband in an armed struggle with a person upon whom the deputy served an arrest warrant. Although Judge Van Antwerpen held that the state-created danger theory did not apply to that case, his opinion does not suggest any doubt as to whether the state-created danger doctrine would be recognized in the Third Circuit as of that time.[11] In fact, he states:

> A review of Third Circuit precedent and the cases cited by plaintiff . . . convinces us

**9.** After discussing the facts in *Cornelius v. Town of Highland Lake, Alabama,* 880 F.2d 348 (11th Cir.1989), and *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), the court stated, "We are, of course, not bound by *Cornelius* and *Wood.*" *Brown,* 922 F.2d at 1115. The court, however, did not explicitly state its hesitation to "adopt" or recognize the state-created danger doctrine as a legitimate theory under the Fourteenth Amendment substantive due process clause.

**10.** Although decided after September 22, 1993, these decisions concerning the state-created danger doctrine were based upon the Third Circuit precedents as set forth in 1990 in *Brown* and in 1992 in *D.R.*—precedents established before DiJoseph was shot. Hence, these cases are relevant in showing how district court judges under-

stood the state-created danger doctrine in this Circuit pre*Mark* even if they were decided after September 22, 1993.

**11.** This case was decided before *Mark v. Borough of Hatboro,* 51 F.3d 1137 (3d Cir.1995), in which the Third Circuit expressed reservations about whether the state-created danger doctrine was a "viable mechanism for finding a constitutional injury." *Id.* at 1152. Therefore, Judge Van Antwerpen based his decision upon the only Circuit precedents discussing state-created danger at that time, *Brown v. Grabowski,* 922 F.2d 1097 (3d Cir.1990) and *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364 (3d Cir. 1992) (in banc)—the same existing precedents that governed the law on September 22, 1993, the date DiJoseph was shot.

that [the state-created danger doctrine] is relatively narrow and has no applicability to the situation at hand.

*Id.* at 355. Thus, precedent as of January 31, 1995, led Judge Van Antwerpen to believe that the state-created danger was an established—albeit narrow—doctrine recognized by Third Circuit jurisprudence. Similarly, on March 16, 1995, in *Doe v. Methacton Sch. Dist.,* 880 F.Supp. 380 (E.D.Pa.1995), Judge J. Curtis Joyner considered the applicability of the state-created danger doctrine in a sexual abuse case brought by a student against her teacher. Although he found that it did not apply, he also did not suggest that the law concerning that doctrine was unclear in this Circuit.[12]

After my further examination of the Third–Circuit's direction in *Brown* and *D.R.,* two pre-September 22, 1993, cases, interpretations of the state-created danger doctrine from those two Third Circuit cases by my colleagues within the Eastern District of Pennsylvania, and the multitude of other circuits and district courts that recognize the state-created danger doctrine both pre-*DeShaney* and pre-September 22, 1993, I believe that a reasonable official would understand that by putting an individual in danger, increasing his or her risk of harm, or rendering him or her more vulnerable to danger would have violated that individual's Fourteenth Amendment substantive due process rights.

Furthermore, I am persuaded by the reasoning of the Ninth Circuit in *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), when it determined that the state-created danger doctrine was clearly established in that circuit despite the fact that it was a matter of first impression before the court. It stated:

At the time of the incident in this case, no other case had rejected a section 1983

claim such as Wood's. There was no "wide diversity" of cases which had considered such claims and which had arrived at differing results.

*Id.* at 595. Quite similarly, despite my extensive research into this subject, I have yet to find a court to explicitly denounce the state-created danger doctrine as an illegitimate theory upon which to base a § 1983 constitutional claim. Therefore, upon reconsideration, I find that in light of the law on the state-created danger doctrine as it was understood in this Circuit on September 22, 1993, the date DiJoseph was shot, the state-created danger doctrine was clearly established.

As a result, I must now turn to the issue of whether Officers Mattiacci and Hairston affirmatively placed DiJoseph into danger or rendered him more vulnerable by returning the gun to DiJoseph and failing to take him into custody for a mental evaluation despite his noticeably agitated state of mind.

## 2. Did Officers Mattiacci and Hairston create a danger to DiJoseph by returning his gun to him?

■ DiJoseph claims that Officers Mattiacci and Hairston violated his Fourteenth Amendment substantive due process rights under the state-created danger doctrine when they returned the handgun to DiJoseph despite his noticeably agitated behavior. Because the officers failed to secure him by retaining his handgun and taking him into custody for a mental evaluation, DiJoseph argues that with deliberate indifference the officers placed him into a situation of great danger. Pl.'s Mem. L. Resp. to Defs.' Mot. Summ. J. at 23. I will now consider whether Officers Mattiacci and Hairston did, in fact, create a danger to DiJoseph by returning his

---

**12.** On March 31, 1995, *Mark v. Borough of Hatboro,* 51 F.3d 1137 (3d Cir.1995), was decided, expressing doubt as to whether the state-created danger doctrine was a recognized theory in the Third Circuit. After *Mark,* lower courts apparently treated the state-created danger theory with greater caution. After specifically noting the Third Circuit's reservation in *Mark* about adopting the state-created danger theory, the court in *Ford v. Johnson,* 899 F.Supp. 227 (W.D.Pa.1995), stated:

[T]o the extent that the Third Circuit would recognize the state-created danger theory as a viable theory of constitutional recovery, Ford has alleged sufficient facts to establish a prima facie case of state-created danger.

*Id.* at 233. Hence, despite the fact that the Third Circuit had yet to adopt the state-created danger theory in *Kneipp,* the court still permitted the action to proceed beyond summary judgment.

gun while he was in an emotionally agitated state.

In *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996), the Third Circuit held that the plaintiff established a prima facie case that the state created a danger of harm to the plaintiff when the police sent a visibly intoxicated woman home alone. In *Kneipp*, plaintiff Samantha Kneipp and her husband Joseph Kneipp were walking home from a tavern when Officer Wesley Tedder stopped them for creating a disturbance on the highway. According to her husband, Ms. Kneipp was visibly intoxicated, smelled of urine, staggered when she walked, at times was unable to walk without assistance, and had to be carried part of the way home. *Id.* at 1201. After some questioning, three other officers arrived on the scene. Concerned about relieving the babysitter watching his son, Mr. Kneipp asked one of those officers if he could go home. The officer said that he could. When Mr. Kneipp left, Ms. Kneipp was leaning on a police car, and Mr. Kneipp testified that he assumed that the officers would take his wife to the hospital, the police station, or would at least take care of her because of her inebriated condition. *Id.* at 1202. Instead, Officer Tedder sent Ms. Kneipp home without assistance. Almost two hours later, Ms. Kneipp was found unconscious in an embankment across the street from her apartment. She suffered from hypothermia which caused a condition that resulted in brain damage. *Id.* at 1203. On these facts, the Third Circuit found that the plaintiff raised a "triable issue of fact as to whether the police officers affirmatively placed [Ms. Kneipp] in a position of danger," *Id.* at 1211, because they

> cut off [Ms. Kneipp's] private source of protection by giving [her husband] permission to go home alone, thereby increasing the danger that [Ms. Kneipp] would suffer harm in her visibly intoxicated state when they abandoned her.

*Id.* at 1210.

In *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), the Ninth Circuit held that the plaintiff raised a triable issue of fact as to whether a Washington State Trooper affirmatively placed a woman in a position of danger when he stranded her, the passenger of a drunk driver, along the side of the road in a high violent-crime area at 2:30 a.m. after arresting the driver and impounding his car. *Id.* at 586. During her five-mile walk home and after declining offers for rides from three or four strangers, the plaintiff accepted a ride from a stranger who took her to a secluded area and raped her.

In *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364 (3d Cir.1992) (in banc), the Third Circuit held that the plaintiffs did not assert a state-created danger claim when two female students in a graphic arts class in a public high school alleged that several male students in the class physically, verbally, and sexually molested them in a unisex bathroom and a darkroom that were part of the classroom. *Id.* at 1366. During the time the alleged incidents took place, a student teacher instructed the classroom. Although the plaintiffs did not specifically inform the student teacher that they were being molested, they asserted that she was or should have been in the classroom at the time the sexual acts took place and that she heard or should have heard the incidents taking place. *Id.* at 1366. One of the plaintiffs also claimed to have told the Assistant Director of the school that one of the student defendants was trying to force her into the bathroom to coerce her into engaging in sexual acts. The Assistant Director allegedly did nothing. *Id.* The plaintiffs thus argued that the defendant school officials "created a climate which facilitated sexual and physical abuse of students," thereby creating an obligation on the state to protect the students from violations of their bodily integrity. *Id.* at 1373. The court noted that the state-created danger theory is premised upon a state's "affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger." *Id.* at 1374. The court found, however, that the defendants' actions in this case did not give rise to the dangers the plaintiffs faced. While the failure of the school defendants to more closely supervise and control the class may have created a risk that the students would not receive adequate instruction or physical harm resulting from horseplay, the plaintiffs

did not complain of that type of foreseeable harm. The school defendants could not be held liable for the sexual molestation of other students—who were private individuals—because the plaintiffs could not show that the defendants actually created the danger, increased the plaintiffs' risk of harm, or made them more vulnerable to that harm. The court explained:

> Plaintiffs' harm came about solely through the acts of private persons without the level of intermingling of state conduct with private violence that supported liability in *Wood, Swader,* and *Cornelius.*

*Id.* at 1374–75.

In *Losinski v. County of Trempealeau,* 946 F.2d 544 (7th Cir.1991), the Seventh Circuit held that the state did not create a danger to decedent Julie Losinski when a deputy sheriff failed to protect her, a victim of domestic violence, from her husband, who shot and killed her in the deputy's presence. After a domestic dispute between the Ms. Losinski and her husband, Mr. Losinski, in which sheriffs were summoned to the Losinski trailer home, the decedent filed for divorce. When a family court commissioner permitted her to return to her husband's trailer to obtain her and her children's personal items, Ms. Losinski and her mother, Marion Simon, requested police protection "in light of Mr. Losinski's violent tendencies and the guns he kept in the trailer." *Id.* As a result, a deputy sheriff, Robert Hovell, accompanied the women and Craig Goodroad, Ms. Losinski's brother-in-law, to the Losinski trailer. According to the deposition of Mr. Goodroad, Ms. Losinski feared returning to the trailer without police protection and may not have gone without it. In addition, Ms. Simon told the deputy that the husband might shoot Ms. Losinski and also that the husband had loaded guns in his house. When Ms. Losinski, Ms. Simon, Mr. Goodroad, and Deputy Hovell arrived at the trailer, Mr. Losinski appeared at its entrance and vocalized his desire to speak with his wife alone inside the trailer. Deputy Hovell asked Ms. Losinski if she wanted to speak with her husband and

allowed her to do so, leaving everyone else outside.[13] Ms. Simon testified that she could hear Mr. Losinski arguing with Ms. Losinski during that time, and four or five minutes later, the deputy knocked on the door and interrupted the private argument by entering the trailer. The deputy, however, did not attempt to interrupt the argument, order Mr. Losinski out of the trailer, ask about his weapons, or attempt to separate Mr. Losinski from Ms. Losinski. Mr. Losinski and Ms. Losinski continued to argue in the bedroom while everyone else stood in an adjacent hallway. About an hour later, Mr. Losinski took out a gun and shot Ms. Losinski twice. She subsequently died.

Ms. Losinski's children and her estate brought a § 1983 action claiming, *inter alia,* that the state violated her Fourteenth Amendment substantive due process rights under a state-created danger theory on the grounds that the decedent may not have gone back to her husband's trailer—given her fearful reservations—without the deputy's escort. By agreeing to accompany Ms. Losinski to the trailer, plaintiffs argued, the deputy became responsible for her welfare and protection because she would not have otherwise gone. *Id.* at 550. Thus, plaintiffs contended that the state created a dangerous situation that ultimately resulted in her death. The Seventh Circuit was not persuaded. To begin with, the state did not create the danger to Ms. Losinski. Rather, the danger came from a private citizen, Mr. Losinski, and not the state itself. In addition, the state did not involuntarily subject Ms. Losinski to an existing danger. The court explained:

> Although the state walked with Julie [Losinski] as she approached the "lion's den," it did not force her to proceed. It did not encourage her to continue. And once the group arrived at the house ..., it did not require her to stay.

*Id.* Thus, the court reasoned that the plaintiffs could not recover under a state-created danger theory.

---

**13.** The court's opinion does not state that Ms. Losinski in fact said that she did want to speak

with her husband.

In all of the aforementioned cases, the courts focused upon the actions of the state actor to determine if his or her behavior directly and foreseeably caused · or created the danger to the plaintiff or rendered the plaintiff more vulnerable to the harm ultimately caused. In *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996), the Third Circuit adopted a four-part test to analyze factors it found common to all state-created danger cases to determine whether that theory applies in any given case:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Id.* at 1208 (quoting *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.1995)).

Applying the *Kneipp* test, it is clear that Officers Mattiacci and Hairston did not create the danger that ultimately caused harm to DiJoseph. To begin with, DiJoseph's ultimate harm was not foreseeable nor fairly direct. DiJoseph's harm resulted from being shot during a confrontation with Officer Vuotto, a member of the StakeOut Unit.[14] When Officers Mattiacci and Hairston returned the gun to DiJoseph and failed to take him into custody, however, they were responding to possible burglary at the DiJoseph residence. At that time, not only was it not foreseeable that the StakeOut Unit would later arrive in response to a barricaded man or hostage situation, it was also not foreseeable that DiJoseph would get shot as a result.

Second, DiJoseph has not adduced sufficient evidence to demonstrate that Officers Mattiacci and Hairston acted in willful disregard for his safety. Unlike the state trooper in *Wood* who stranded a woman by the side of the road five miles from her home at 2:30 a.m. in a high violent crime area, Officers Mattiacci and Hairston's actions do not rise to the extreme level of willful disregard for the safety of DiJoseph. To the contrary, the officers called DiJoseph's wife at work to inquire about the sensibility of her husband possessing a gun in his anxious state. Ms. DiJoseph assured them it was fine for her husband to have a gun and verified that he had a gun permit.[15] DiJoseph has produced no evidence other than that the officers returned his gun to demonstrate this willful disregard element of his case. While I express no opinion about the appropriateness of the officers' actions, I find that DiJoseph has not met his burden in demonstrating that the officers possess the requisite mental state of willful disregard sufficient to defeat defendants' Motion for Summary Judgment.

DiJoseph also fails to establish the third element of the *Kneipp* test—the existence of some relationship between the state and DiJoseph. According to *Kneipp*, the relationship requirement "contemplates some contact such that the plaintiff was a foreseeable victim of [the] defendant's acts in a tort sense." *Kneipp*, 95 F.3d at 1209 n. 22. As I have already discussed with respect to the first element of the test, DiJoseph's harm was not foreseeable nor fairly direct. Accordingly, DiJoseph was not a foreseeable victim subject to harm when the officers returned the gun and failed to take him into custody.

Finally, DiJoseph does not show that Officers Mattiacci and Hairston used their au-

---

**14.** The StakeOut Unit is a support unit that responds to barricaded person, hostage, and high-risk warrant situations. Dep. Corporal DeJarnette at 8.

**15.** In addition, the officers visited Ms. DiJoseph at work to discuss DiJoseph's anxious demeanor after having spoken with her on the phone. The officers also called for a supervisor once they were summoned back to DiJoseph's residence on the pretext that DiJoseph was holding hostages. Officer Hairston testified:

> After hearing what his wife told me after I went to her employment, I felt as though we needed a supervisor there in case somebody was in there or in case this guy was just having problems.

Dep. George Hairston at 24. These actions also indicate that the officers did not act in willful disregard to DiJoseph. Nevertheless, because the officers had already returned the gun before these actions took place, the state-created danger claim must be examined from the perspective of how the officers acted at the time they returned the gun to DiJoseph.

thority to create an opportunity that otherwise would not have existed for DiJoseph's ultimate harm to occur. In this case, after the officers returned the gun to DiJoseph, they left. At that point, DiJoseph remained in the safety of his home and was not in a position of danger. While DiJoseph contends that the officers created a "very dangerous situation" by giving the gun back to him and failing to take him into custody for an immediate mental evaluation, DiJoseph fails to link the danger that was allegedly created with the harm ultimately caused. *See D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364 (3d Cir.1992) (in banc) (foreseeable harm from lack of supervision or control over classroom is poorer education or harm from roughhousing, not sexual molestation). That the officers may have placed DiJoseph in a position of danger is not sufficient to state a claim under the state-created danger doctrine. Rather, to be cognizable, the officers must have placed DiJoseph in a position of danger from which "the harm ultimately caused [is] foreseeable and fairly direct." *Kneipp*, 95 F.3d at 1208. In this case, by returning the gun to DiJoseph and by failing to take him into custody for a mental examination, Officers Mattiacci and Hairston did not create a dangerous situation whereby DiJoseph would directly and foreseeably summon the police back to his house, declare him to be a barricaded man, and ultimately shoot him. In other words, the officers did not create a situation of danger such that it was likely that DiJoseph would get shot by a police officer nor did they render him more vulnerable to that danger.[16]

While one might argue that had Officers Mattiacci and Hairston not given the gun back to DiJoseph and had taken him into custody for a mental examination the encoun-

ter in which DiJoseph was shot never would have happened, as in *Losinski*, that argument must fail. The deputy sheriff was not liable for the death of Julie Losinski even though she may not have gone back to her husband's trailer without his escort because the deputy did not create the danger. Similarly, the officers here did not create the danger in this case by returning the gun to DiJoseph. After the officers left DiJoseph's residence, it was DiJoseph who summoned the police back to his home by claiming that he was holding hostages in his home. Dep. George Hairston at 21–22. Hence, DiJoseph, if anyone, put himself into a position of danger when he beckoned the police back to his house under the pretext that he was holding hostages. Therefore, I hold that the act of giving DiJoseph back his gun or failing to take him into custody did not create the events which ultimately caused his harm.[17] As a result, I will reaffirm the grant of Officer Mattiacci and Hairston's Motion for Summary Judgment.

**B. Are Officers Mattiacci and Hairston liable for affirmatively allowing DiJoseph to be declared a "barricaded man"?**

DiJoseph premises his second basis of liability upon the theory that Officers Mattiacci and Hairston affirmatively allowed DiJoseph to be declared a "barricaded man" despite the fact that they knew he did not fit the Police Regulations' definition of the term. DiJoseph contends that the officers did not follow Philadelphia Police Department directives concerning the protocol in dealing with barricaded persons in that they had a duty to "ascertain if the incident is actually a barricaded person or a hostage situation." Philadelphia Police Department Directive 111 Section IV(A)(1). DiJoseph asserts that the

---

**16.** To speculate, Officers Mattiacci and Hairston may have been found liable under the state-created danger doctrine had DiJoseph ultimately inflicted himself with harm from the gun after it was returned. Alternatively, DiJoseph may have stated a claim had he threatened the officers with the gun after they returned it, thereby causing them to respond with deadly force. In each of those situations, the harm ultimately caused would be a fairly direct and foreseeable result of the situation created by the officers.

**17.** Furthermore, Officers Mattiacci and Hairston did not create a dangerous situation in which DiJoseph might harm himself. According to his own argument, DiJoseph maintains that he never posed a danger to anyone at any time. *See* Pl.'s Answer to Defs.' Mot. Summ. J. at 3(¶ 5) ("[A]t NO time did Mr. DiJoseph threaten to harm himself or anyone else.") (emphasis in original). In any event, DiJoseph's harm was not self-inflicted.

officers knew that this situation was neither a barricaded person nor a hostage situation, but the officers nevertheless failed to inform their supervisors otherwise.

Philadelphia Police Department Directive 111 states:

> A barricaded person is usually, but not always, one or a combination of two basic types of individuals:
>
> (1) A suspect who may be cornered at or near a crime scene with or without a weapon.
>
> (2) Emotionally unstable person who has taken a position, inside or outside, and has indicated by action or implication that he intends to harm himself.

Philadelphia Police Department Directive 111 § II(A)(1)-(2). In addition, Directive 111 also commands:

> First officer on the scene ... will:
>
> (1) Ascertain if the incident is actually a barricaded person or a hostage situation, nor merely a person chased by police into a building who refuses to communicate with police, and immediately notify Police Radio of conditions.

*Id.* § IV(A)(1).

Although DiJoseph points with specificity to the Police Directives that he claims Officers Mattiacci and Hairston violated by affirmatively allowing him to be declared a barricaded man, he fails to indicate under which federal constitutional or statutory scheme he asserts this § 1983 claim. In his complaint, DiJoseph contended that his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments were violated. In *DiJoseph I,* however, I determined that DiJoseph's Fifth and Eighth Amendment rights were not implicated in any way. *DiJoseph I,* n. 10. In addition, the Fourth Amendment excessive force claim solely concerns Officer Vuotto, the officer who shot him and who was denied summary judgment in *DiJoseph I.* Therefore, the only constitutional right under which DiJoseph could advance this claim of affirmatively allowing him to be declared a barricaded man is the Fourteenth Amendment substantive due process clause.

DiJoseph fails to show how his Fourteenth Amendment substantive due process rights were implicated by the actions of Officers Mattiacci and Hairston by affirmatively allowing him to be declared a barricaded man. It is clear that DiJoseph is not advancing another state-created danger theory because he states:

> In addition to a state-created danger theory against these defendants, plaintiffs have also asserted the theory that these defendants allowed the plaintiff to be declared a "barricaded man," even though they knew that plaintiff had no hostage in his house, and had never threatened himself or others.

Pl.'s Mot. for Recons. at 3(¶ 2). In order to establish a cognizable substantive due process claim under the Fourteenth Amendment, therefore, DiJoseph would have to establish that the actions of Officers Mattiacci and Hairston were an "abuse of governmental power," *Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992), or that such actions "shock the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952). DiJoseph, however, makes no such claim. In addition, even if the officers breached a duty under state law by permitting DiJoseph to be improperly declared a barricaded man, it is well-established that "duties under state law cannot create constitutional obligations," *Fagan v. City of Vineland,* 22 F.3d 1296, 1308 n. 9 (3d Cir.1994) (in banc) and that "violations of state law ... are insufficient to state a claim under § 1983." *Kulwicki v. Dawson,* 969 F.2d 1454, 1468 (3d Cir.1992). Insofar as DiJoseph is basing his claim upon duties entrusted by state law, he does not state a claim under § 1983.

■ In addition to DiJoseph's failure to state a claim under § 1983, the record flatly contradicts DiJoseph's contention that "[Officers Mattiacci and Hairston] knew it was neither a barricaded man nor a hostage situation, yet they failed to advise their superiors of the facts." Pl.'s Mot. for Recons. at 4(¶ 2). In his deposition, Officer Hairston testified to telling his supervisor all the facts that preceded the Lieutenant's arrival. *See* Dep. George Hairston at 25. Moreover, Officer Hairston vocalized uncertainty as to whether

he thought a hostage was present in DiJoseph's house. *See id.* at 47–48. Hence, contrary to what DiJoseph claims, Officer Hairston apparently did transmit the facts of the incident to his supervisors. DiJoseph has not come forth with any evidence disputing Officer Hairston's testimony and has thus not met his burden on this claim. Therefore, upon reconsideration of DiJoseph's assertion that Officers Mattiacci and Hairston affirmatively allowed him to be declared a barricaded man, I conclude that he fails to state a claim under § 1983. As a result, I will deny DiJoseph's Motion for Reconsideration on this claim.

## C. Does the City of Philadelphia have an unconstitutional policy or practice in treating emotionally disturbed individuals as barricaded persons?

DiJoseph claims that the inadequate city policy of treating emotionally disturbed individuals as barricaded persons facilitated the unfortunate shooting in this case. Because the police improperly declared him to be a barricaded man when he was not, DiJoseph asserts that the City has adopted an unconstitutional policy or practice whereby emotionally disturbed individuals are treated as barricaded persons. Thus, he seeks to hold Commissioner Neal and the City of Philadelphia liable for his injuries.

### 1. Police Commissioner Neal

Police Commissioner Neal is the top policymaker for the Philadelphia Police Department, and DiJoseph seeks to hold him liable for what DiJoseph asserts is an unconstitutional policy or practice in treating emotionally disturbed individuals as barricaded persons. In *DiJoseph I,* I determined that Commissioner Neal could not be subjected to personal liability without a demonstration of his personal involvement in this particular case. DiJoseph had shown none then, and he has not redirected me to any evidence in the record that would indicate otherwise. Based on the evidence before me, I cannot hold Commissioner Neal liable in this case simply because of his official position within the Philadelphia Police Department. Therefore, I will affirm Neal's Motion for Sum-

mary Judgment and deny DiJoseph's Motion for Reconsideration.

### 2. City of Philadelphia

■ DiJoseph also seeks to hold the City of Philadelphia liable for its allegedly unconstitutional policy and practice of treating emotionally disturbed individuals as barricaded persons. In *DiJoseph I,* I addressed a similar claim against the City alleging that the City failed to provide adequate training to its officers regarding the difference between emotionally disturbed individuals and barricaded persons. In *DiJoseph I,* I found that DiJoseph had produced no probative evidence on the nature and quality of the Philadelphia Police Department's training program, and therefore I granted the City's Motion for Summary Judgment on that claim. DiJoseph suffers from the same evidentiary deficiency with respect to his present claim concerning the unconstitutional policy or practice of the City: he has produced no evidence to support it. In his Motion for Reconsideration, DiJoseph attempts to circumvent this problem by pledging to prove his case at trial. He states:

> In the present case, plaintiffs will prove that the policies of the City of Philadelphia regarding emotionally disturbed persons are wholly inadequate.

Pl.'s Mot. Recons. at 4. Furthermore, he adds:

> Plaintiffs will prove that by treating emotionally disturbed persons who have committed no crime in the same manner as fleeing criminals or persons who have threatened to harm themselves or others, identically, the City of Philadelphia has adopted an unconstitutional policy or practice.

*Id.* at 5. DiJoseph, however, cannot prove at trial what he is required to show at summary judgment. "Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Essentially, DiJoseph's contention rests on

nothing more than his mere pleadings. Although he produces the Philadelphia Police Department procedures for handling mentally disturbed individuals and barricaded persons, DiJoseph has produced no evidence to support his assertion about the City's allegedly unconstitutional policy or practice, and therefore he has failed to show the existence of a genuine issue of material fact. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24, 106 S.Ct. at 2553. As DiJoseph's claim concerning the unconstitutional policy or practice in dealing with emotionally disturbed individuals and barricaded persons is factually unsupported, I will also deny DiJoseph's Motion for Reconsideration against the City of Philadelphia.

### *ORDER*

**AND NOW**, this 31st day of January, 1997, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Reconsideration is hereby **GRANTED**;

(2) Deborah Mattiacci's Motion for Summary Judgment is **GRANTED**;

(3) George Hairston's Motion for Summary Judgment is **GRANTED**.